You may proceed Mr. O'Neill. May it please the court, Deputy Colonna was parked on the side of the highway and observed Mr. Larremore drive by him. He then did a U-turn pulling out and racing to catch up with Mr. Larremore, reaching speeds up to 94 miles an hour. Once he caught up with Mr. Larremore, he followed him within a second point within 100 feet of the rear of Mr. Larremore's trailer. How long did he follow him? I'm sorry? Approximately one mile. One mile? Yes sir. Did he ever engage his emergency lights or his siren? No Your Honor. How close was he? He looked pretty close. So I think the best estimate of that comes from Deputy Colonna's testimony towards the beginning of cross-examination and the motion to suppress hearing. I think it's even more illustrative of the video because it shows, you know, how fast they were going. So Deputy Colonna testifies that he was about one second behind him and the Texas driving handbook says that he should be at least two seconds behind somebody at this. I mean he's right on him. I mean he's gone 100, not quite 100, but 90 something miles to get up to him and then he's right on him for some length of time. How long of a time was that? I think it's about, I think it was about a mile. I don't remember the time it took. Oh, a whole mile. And they were traveling for that entire mile over 60 miles an hour. So he pulls off what you think is what you do when you're being polite to let somebody go past you on one of those kind of roads. Absolutely Chief Judge Elrod, yes. So I think a person in that situation says, you know, I'm going to pull over because either the officer's trying to get around me or whomever is behind you driving in that manner, you think either they're trying to get around me or they're trying to engage with me, so you pull over in order to end that driving dynamic. I think it's remarkably different than a situation where an officer approaches somebody on the street because there you would walk away in order to end the dynamic. But here when you're actively driving, the way to end the dynamic is to pull over. The way to sort of ignore the officer and go about your business is to pull over. I know we're going to go through the chronology here, interesting set of facts as it unfolds, but do you contend that your client's pulling over under those circumstances, was it Terry's stop or any type of seizure or detention? So I want to be really precise about when I think that the seizure happens. It's not when my client pulls over, but it's when the officer pulls in behind him and then gets out of his cruiser, a marked cruiser, wearing his uniform and approaches him. Okay. If he says anything, it's when he approaches the vehicle. Correct Your Honor, because that's when he takes an action and his uniform is a show of authority combined with those actions, communicates to a reasonable person in Mr. Larimore's position that he's not free to drive off and ignore the officer. Does it matter for purposes of your argument whether or not the Terry stop was initiated at that point or instead whenever he put his arm into the vehicle so he couldn't have driven off without hurting the officer or if it was in a third time whenever he said, hold up, don't go anywhere. Does it matter based upon, does your argument depend upon it being the first time that you just answered to Judge Inglehart as opposed to either the other two times? So I appreciate that Chief Judge. My argument is the same if it's the approach in uniform or if it's the, you know, making physical contact with the car, sticking the hand in the car to where a person wouldn't be able to safely drive away. My argument changes a little bit if it's when he's, if he's seized when the deputy says hang on a second. And the reason it changes a little bit is because at the point when the deputy says hang on a second, he's observed the open container of alcohol in the back seat. So in order for me to, if it's hang, if it's at the hang on a second point, I think I have to either show that uh, which the district court found and the government doesn't contest that the observation of the alcohol was the fruit of an unlawful search or I have to show that the investigation into the open container violation was not expeditiously investigated such that the open container didn't, uh, you know, justify the reasonable suspicion that, uh, or support rather the reasonable suspicion that then, uh, would have justified it. How long did this entire, from the time that, um, the person pulled over until, until the discovery of the people in the horse trailer, how much time elapsed totally, totally? About 16 minutes. I have the precise, um, time if you give me just a second. Um, I think the, the, the, the admission, so the discovery of the people actually took a little while. Um, but really what happened was the, the, the key sort of time, uh, stamp is Mr. Laramore saying I, I've got three cousins, uh, in this, uh, you know, compartment of the horse trailer. Um, so that's when I believe the deputy clone has probable cause. Um, and that happens just after 1730 on government's exhibit two, uh, which basically starts at the beginning of the conversation. So as we've discussed, uh, and as Chief Judge Elrod lays out, I think that not only was the approach followed, uh, the, the driving followed by the approach of seizure, uh, the physical contact with the car making it dangerous for Mr. Laramore to drive away, uh, communicated to a reasonable person in his position that he wasn't free to leave, hit the officers making contact with his car in order to lean into the back and search it, especially given that Mr. Laramore was able to observe that, communicated to a reasonable person in his position that he was not free to leave, and the officer's instruction to hang on a second similarly communicated a seizure. The only thing that the district court, uh, and the government say in response to that is that Laramore did not perfectly comply with the officer's instruction to hang on a sec. Uh, the district court makes a factual finding there because the district court finds that he immediately exited his truck. If you watch government's, uh, one and two together, it's clear that he doesn't exit his truck until Deputy Colonna has already walked towards the, uh, sort of parallel with the trailer as if he's going to his cruiser and then deviates to show more interest in the trailer again. That's what causes Mr. Laramore to exit and speak with him. Doesn't he put his arm on the trailer? He pats the trailer. Yes, he does pat the trailer. And then he comes out. Yes. And then Mr. Laramore comes out between the vehicles. I mean, you did, you know. Absolutely. Um, and I think, you know, Wright tells us pretty clearly that, you know, even when an officer tells you to hang on a sec, as long as you stay on the scene and don't leave, you are complying with that command. Uh, you are acceding to the seizure. But do you have a problem here because we have, uh, great respect for the proceedings of the district court who has heard, have heard from the relevant people and we're supposed to, uh, defer to the factual findings. Do you, are you saying there is clear error or do you believe that there's an erroneous legal determination that has infected this? I think there is clear error as to a very few number of the facts, um, and as to the ultimate conclusion that Laramore, that these, that these actions that the deputy took up until this point, uh, were not a seizure. Uh, but I think there were also conclusions of law, for example, where the district court finds that perhaps a reasonable, uh, person in Mr. Laramore's position would, uh, perceive these things as a seizure, but then the district court says there were, there wasn't, you know, a command, uh, in, in the way that there was in, uh, Morris and Wright or there wasn't, uh, flashing lights in the way that there was in Wright. I think finding that, that, that there's a specific type of way that a person can see, be seized and that this fell out of those, uh, that, that universe of these prior examples rather as opposed to just standing, applying the straightforward reasonable person test. I do think that was an error of law. Um, but I think because every, all of this is captured on the video, there was not actually very much that Deputy Colonna, you know, interpreted in his testimony, uh, to indicate that, uh, you know, or to make this court doubt what's on, on the video and because this court is. So, are you saying this is a Scott B. Harris moment where we can override because the video clearly shows certain things? Is that what you're saying? Yes, that's, that's precisely my argument. Uh, but also, I would encourage you to read Deputy Colonna's testimony. I mean, he, at Record 224, he agrees that a reasonable person might feel like an officer driving that way, um, is trying to pull him over. At Record 244, uh, he, it says he was trying to get close enough to read, uh, the, to read the license plate and that's why he was driving in that manner. Um, at Record 216 to 17, he agrees that he would not have felt free to leave after hearing, hang on a sec. So, to the extent that there was live testimony, the, the, the testimony of Deputy Colonna, I think very much, uh, supports the defense's arguments here. Did Deputy Colonna indicate, and I can't remember this, that he actually thought it was drugs, or was he just using drugs as a ruse, um, to try to engage? So, the only time that Deputy Colonna explicitly gives his opinion, I think, is after Mr. Laramore, uh, admits that there were people in the, uh, trailer. Uh, Deputy Colonna says, oh, I thought you had drugs, um, but I knew you were up to something. Okay. So, he is saying, because before when he's trying to engage him to unlock the trailer, he's saying, well, I want to make sure you don't have any drugs there. Right. So, that's not a ruse. That's, it doesn't matter. I mean, he could, he could lie to him. Right, right. Uh, yes, and, and that's true. He, he, he says, I think, you know, I really need to look in the trailer. Um, I think you're up to something. He gives a sort of, you know, description, you know, Mr. Laramore, I know, you know, you're, you know, I, I, I think you maybe have been doing this a long time. He does mention in the video things like that. At test, in the, in the hearing, he never says that he developed a reasonable suspicion or a probable cause prior to Mr. Laramore, uh, saying that he had people in the back of the trailer. So, when is it that the, the, the district court determined he was not free to leave? The district court determined he was not free to leave when, uh, Deputy Colonna told Mr. Laramore that he was stuck, uh, and that he needed to look inside of that trailer. But not at the point where he said, hold on? Not at, he, the, the district court explicitly says that that wasn't, that that was not a seizure. The district court found that, that not to be a seizure. Um, so, he, uh, the district court finds the seizure and then the next important facts that follow that, um, are the request for consent to search. Uh, it's, uh, the district court finds consent. Um, it's really important to pay attention to the language that was used. Mr. Laramore, when first asked to consent, he says, well, the trailer's locked. Uh, Deputy Colonna says, well, if I could, you know, if I get some, uh, if, if, would you help me if it weren't locked? And Mr. Laramore says, yes. And he says, well, I've got some bolt cutters and I can get some bolt cutters. Mr. Laramore, you know, equivocates a little bit, says, get your bolt cutters, and then immediately says something that's partially audible, partially muffled, uh, by the officer, uh, you know, touching him, uh, his, his chest where the body camera is. Uh, but the officer, at the very least, understands him to be either giving consent or revoking it. Uh, our argument is that he never gave consent at all because saying, get your bolt cutters, um, or agreeing to the counterfactual, I would like to help you if I could, neither of those are consent to search. Even if they... What if he, what if he did revoke as opposed to that original... I don't think that changes the analysis at all because the, uh, the discussion then continues for another 10 minutes, uh, where the revocation becomes clearer and clearer. Uh, at one point Mr. Laramore says, well, go get your dog, or I'd prefer that you get your dog. Uh, and he asserts, I have my rights. Um, and it's not until, uh, he gives, uh, he, he gives the statement that he has rights to a probable cause, uh, that the search actually happens. So I think if the revocation happens anywhere between the initial, go get your bolt cutters and the statement that there are three people in the back of the trailer, that doesn't change the argument. You don't think saying get your bolt cutters is some form of consent? No, I think it indicates that he was considering consenting. You know, uh, he, he had said, well, here's this problem, this logistical issue where I can't consent. Uh, and Deputy Colon had said, well, I can solve that for you. And Laramore said, well, let, let's see, go, go get him. Um, but that, I mean, think about what if, what if it had to happen. Deputy Colon would have to walk to his cruiser, get the bolt cutters out, come back, and then presumably he would have said, so I can cut this, you know, kind of thing. I mean, that's how you would sort of politely do this. So I think there's a lot of opportunity. I think get your bolt cutter still leaves it very much up in the air whether Mr. Laramore is consenting to a search of the trailer. Is it a type of consent for him to say, bring your dog? I want your dog to, I mean, basically he's saying, I want you to bring a trained dog to sniff around my trailer, uh, and possibly alert to something, whether it's drugs or whatever. Isn't he consenting to that? So Judge Engelhardt, I would see that perhaps, uh, if it was, if it wasn't the, presented to him as a binary, you know, if it wasn't presented to either you give me consent, um, or I'm getting the dog, um, then I would consider possibly that that would be a consent not to the search, but to a, a further extension of the stop to wait for the dog. And I think if that had happened, this would be a, you know, closer case and a harder argument. I was asking in the context of a, a, if, if we say that he withdrew his consent, I think at one point he says, I don't want you to search the trailer. Yes, sir. I think that's after the bolt cutter comment. Yes, sir. Uh, but then he says, well, bring the dog, bring the dog, bring the dog. So in other words, he's okay with that. Well, I hear it more as I would rather you have to get the dog because I know the dog, because the dog isn't going to alert and I don't have to sacrifice my privacy rights. But he's only saying that in response to either you consent or I'm getting the dog. It's not a, can I drive away peaceably time? There's not a third option there. I don't think so. Yeah. And I think if he'd been presented with that third option, he would have gladly taken it. What about though, I'm, I'm confused about what role the trespass, um, the, you know, the, the district court found that there was a trespassery search, um, you know, with, with the container and all of that. So what, what role does that play in this and does that help you in any way? Yes, Your Honor. I think it plays two roles. First, I think if the seizure is found after hang on a sec, um, the fact that it was a trespassery search that led to the observation of the open container means that, uh, there wasn't probable cause supporting the seizure at the hang on a sec. The district court found that there was a trespassery search. Correct. Um, and so I think if the district court were, the district court didn't rely on the fruits of that search to justify the seizure because it didn't find that the seizure happened then. But I think if you were to find that the seizure happens at hang on a sec, you couldn't then say, but it was justified by probable cause because of the observation of the open container. The second, if I might briefly finish answering your question, the second way I think the open container helps the defense is because if the district, if this court, uh, well, it, it, the ultimate search was justified by probable cause if you find that it wasn't justified by consent. When Mr. Laramore, when Mr. Laramore finally gives the statement that gives the probable cause, the statement, the admission that there's three people in the trailer, it's directly after being confronted with the open container. So that statement giving probable cause is one of the fruits of the unlawful trespassery search, uh, that then leads to the probable cause which caused the ultimate search. So I think, I think the open container gives me an independent grounds for suppression in that way. Thank you. You saved time for rebuttal. Yes, Your Honor. Mr. Bannister. Good morning. May it please the court. I am Joshua Bannister on behalf of the United States. The government asked this court to affirm the district court's ruling denying the motion to suppress for two reasons. First, the district court's determination of when the seizure occurs is plausible under the facts of the record. And second, the period of delay between the point at which the district court determined that a seizure detention did in fact occur to the point at which probable cause was to develop for the search was reasonable under the, uh, circumstances. Well, that, that leads, you said is plausible. You very carefully said is plausible. Yes, Your Honor. But, um, what if under Scott v. Harris, we're allowed to look at the video and make the determination and if it's not plausible, that, that the, that there's a given answer and we know what the answer is based upon the video? Yes, Your Honor. How, how does that interact with deferring to a plausible determination? It's an interesting legal issue that's arisen with the use of videos by courts of appeals and the Supreme Court to override, uh, district court determinations still evolving. Yes, Your Honor. Very much so. So the government's position is actually the, the video helps the government's position and so it is very emphatic that this court does in fact look at that video. We would simply argue that upon review of the video and what it shows, there isn't going to be an indication that what the district court found in terms of the facts was not plausible. So certainly the video is very much included in this court's determination, but it still works within that framework of the clear error analysis. Did what the court find as a matter of fact, supported by what that video shows, what, was that a plausible finding? And if not, then of course, yes, this court could then look at essentially the whole thing de novo and substitute essentially its findings for what the district court did. We simply are putting forth that it, it's not necessary to reach that second step because the video itself does in fact support what the district court found. And I'll make a quick note in the record during deputy, um, Colonna's testimony. In fact, between, I believe it was one 96 and one 99 of the record, that's most of his direct testimony. You can actually see in the record that the district court and in fact the government's position was simply to have the district court review the video. And basically his testimony is about sort of why he wanted to follow Larimore to begin with and then what happens after the point of the, the arrest once he has the probable cause. And the middle part really is just letting the video speak for itself because of that. Why don't you begin, uh, you know, you're jumping to where the, where the district court found there to be a detention. Why don't you begin from the beginning and, and discuss the initial pulling over of the, uh, of the truck and whether or not you believe that was, um, uh, uh, coerced by the police officer or whether he pulled over voluntarily? Certainly honored the government's position is that was voluntary. We look at it from the position relying on what this court has actually said in mask that following a vehicle the way the deputy did is really no different than some form of open surveillance. It's not coercive. It does not require whoever's in front of the deputy to actually pull over or to take any action for that matter. I would actually also like to clarify a couple points in the record on what the video shows because there was a judge, you actually had some questions about the distance and the time, whether in terms of the distance, I can't speak specifically about how long the distance, what I can tell you is the deputy comes within sort of a consistent distance with the vehicle at six minutes and 22 seconds on the dash cam video. The vehicle, Mr. Laramore's vehicle then begins to pull over to actually stop at seven minutes and 21 seconds. So depending upon speed, that constant Frank, that constant rate in which he's following lasts for approximately one minute in that period of time. What the video does show is that the deputy is using the hash lines, three hash lines back from Mr. Laramore's vehicle. And in fact, speaking of safe driving, the rear of the side rear view mirror of Mr. Laramore's truck is always in view. And as they say, if you can see the rear view mirror of the truck with a trailer, that truck can see you. The only time that distance actually closes is after about the seven minute mark. You see Mr. Laramore's truck takes something of a gentle curve. It turns just slightly and reduces speed and so that closes the distance. So we would gently push back that the deputy was ever right up on Mr. Laramore. And so because of that, again, it goes back to this plausibility in terms of what the district court found that the deputy was certainly openly surveilling. He had, he was suspect of why Mr. Laramore was there. He had, he had suspicion based upon information he received. That is correct. That he was involved in smuggling. Was it human trafficking or was it drug smuggling or was it just smuggling that in general that he had heard information about? Based on his testimony, Your Honor, it's, the government believes he, his personal inclination was that it was some form of drug smuggling. However, that road in and of itself is used for both. In fact, part of the reason he had the suspicion was that the road to the north of their position is a border patrol checkpoint that is, does not operate 24 seven. And in fact, at the time that he observed Mr. Laramore on the road was about to undergo it. Well, I should say it was, it was closed at the time, but it was at the time that it would undergo a shift change, which is actually a very common practice for smugglers is either. And this is what Mr. Laramore, I'm sorry, Mr. Colonna testified to is that smugglers will either scout the checkpoint so that they know when it's closed or if they don't know or if they know that it's operating, they will try to sneak their loads through at the time of a shift change because. But you don't contend that he had reasonable suspicion for a stop at the beginning of this? No, that was, that's never been the case. I don't want to detract from your argument. Now, was it, was there, well, discuss, discuss the pulling over, discuss whether that would be him just pulling over, but not stopping to allow someone to pass him or pulling over to stop. There's two possibilities there. You know, I know that it is a practice in Texas for people to pull over and let someone come by them, but they wouldn't necessarily come to a stop. They would just pull over and continue to a certain speed and let the other person pass them. And as opposed to someone pulling over and stopping on the side of the road. If I understand Your Honor's question in terms of Mr. Laramore, what we see is Mr. Laramore turns on his blinker, pulls all the way over, and then he doesn't just continue driving. He reduces his speed and then goes not partially, to Your Honor's question, in terms of that kind of getting onto the shoulder but giving enough room for the car to pass. His vehicle goes all the way over off to the side of the road and comes to a complete stop. Our position there is. I'm sorry, Your Honor. He turned the ignition off at that point. I do not believe so, Your Honor, and that's based on the, I think when we get to the body cam, I believe you can still hear the engine running. The car is still shaking his hand. Time. Correct, Your Honor. But he didn't turn the car off. And so our position is, Mr. Laramore, nothing required Mr. Laramore to pull off to the side of the road to let the deputy pass or to stop. The fact that he chose to stop was completely volitional. The fact that the deputy chose likewise to stop and to make contact with him does not, just because he is a deputy, convert that encounter into a detention at that point, and that is what the district court ultimately concluded. Now, now, please discuss the initial approach to the truck and, and, uh, where, where the officer physically touched the truck on where his, he may have crossed the plane of the open window. Yes, Your Honor. So on the dash cam, we see that the officer walks up the side of the truck, looks into the empty trailer, which actually was part of his suspicion. He thought it was odd at this time of day that Mr. Laramore would be on this road with an empty trailer. He then walks up the side of the truck. I would like to make a note that before he ever actually gets to, um, be parallel with the driver, you actually see Mr. Laramore voluntarily drop his rear window that is captured in the body cam. That's never a command given by the deputy and the deputy is not even up parallel when he does it. He, the deputy is then standing approximately three feet away from the truck, and this is when you can marry it up with the body cam. You see him point into the window on the body cam. You hear him say essentially you're Mr. Laramore, right? I thought I recognized you. Mr. Laramore extends his hand and it's at that point the deputy closes the distance and reaches in in order to shake Mr. Laramore's hand. At that point, they're simply in the middle of a conversation and what we actually see and it's, it's more detailed on the body cam than the dash cam because the dash cam is further away, is you just see the deputy having shaken the, uh, Mr. Laramore's hand, leaning against the truck, conversing with him. He's not grasping the truck. He's not holding it or exhibiting any sort of nonverbal action to show that he's trying to hold the truck there. He's simply leaning against it to, uh, Chief Judge Elron's question, with the engine running, trying to talk with the, uh, Mr. Laramore who's inside the truck and in fact, because of the noise, it's, it's hard to hear parts of the conversation because there's so much noise. Our position there is therefore that touching is not a, any sort of physical force with an intent to restrain. It's simply incidental so that the deputy can have a conversation with the, uh, with Mr. Laramore. So, and that is what again the district court concluded, observing in total all of those facts, which then actually brings us to, uh, the statement, the hang on a second for me. The district court concluded, and we believe again, this is reasonable in light of the total record, that one, this was not an instruction. This was not a command. This was simply what two people do in a conversation when one of them has to pause the conversation. Colloquial, colloquially, it was no different than him saying excuse me for a second. What you actually see right before he makes that statement is actually you hear Mr. Laramore talking about taking the trailer to, uh, sell it and you actually hear Mr. Laramore laughing. That's the part that right precedes this break. You hear the deputy say hang on a second for me and even applying the way this court looks at the factors such as language and tone, this court has the benefit of the video and there's even a slight upward lilt in the deputy's tone of voice indicating this isn't some sort of show of authority of a command. This is a request. It's akin to saying excuse me a second. He then steps away and as he testified to, his subjective intent was to go radio his dispatches to let him know where he was. I know, um. What do you do with the statement by the deputy that says a reason, he was asked specifically to say record 216.17, a reasonable person in his shoes would feel, um, to just drive off from that, would a reasonable person feel that they could just drive off from that interaction and he specifically says no, direct no. That, so, the officer himself, the deputy himself thought that he would not, a reasonable person would not feel that he could drive off at that point. And so, that, does that not have any purchase here that the person doing the statement said that a person wouldn't think they could just drive off from making a statement? I don't think so, Your Honor, in the reason, for two reasons. One, it's not about the subjective perception of the deputy, but I think more to the point, I believe the deputy also said. No, it's not about whether he thought he would be. He thought a person should not, and that that would be very suspicious. He has some other language about it, if he would have driven off. Yes, Your Honor, but the point is, the deputy's subjective understanding of whether or not Mr. Larimore was detained, I think the problem with that, and again, it was under cross-examination, but it's essentially trying to supplant the subjective mindset of the deputy for the objective test. Additionally, the deputy also testified in that same vein that he had not detained Mr. Larimore. So, then you essentially have a conflict within the deputy's own testimony, which again, is why actually the government does lean heavily on what the video itself shows in the context of what does the deputy verbally say, what happened right before it, right after it, and what is the deputy's tone of voice. We would submit that's actually far more reliable for the court than the deputy's personal opinion. Well, you didn't start doing that then. There's the issue about the deputy's asserting some dominion over the vehicle by leaning on the vehicle, by getting up with the guy. They're by parking just right there, right on the, just so close and at an angle right there. There are a lot of things that are part of this encounter that make it where the deputy's making his presence known. I'm not saying that's inappropriate, but it takes it away from just, gee whiz, we're two guys having a conversation on the side of the road here, and we're so glad that we're neighbors. It is not that kind of interaction. Certainly not, Your Honor. Certainly, maybe some of the deputy's tone has a little bit of that flavor, but I think to Your Honor's point, it is important that the deputy parks to the rear, again, without the lights, which of course, lights aren't necessarily dispositive, but the fact that there are no lights would cut against a showing of authority. The deputy did not pull in to cut off any avenue of egress. But he's actually close to where he is. I mean, it's not like he's parked a hundred feet behind or something. You know, it's not, he's right up in there. He is, Your Honor. I think part of that is, one, can also be seen as just it makes it easier for the deputy than to walk, one, for safety. He doesn't have to walk as far. Two, the positioning of the patrol car also, just from a pure safety standpoint, actually blocks and then protects Mr. Larimore's vehicle, and there is actually a couple points where you do have, even though it's a bit of a desolate road, there is still traffic out there, and there is a point where two cars do pass by. Do you think it's completely appropriate for the court to look at all of that and to look at him leaning up, for this court to look at all of that, him leaning up against the vehicle and all of that, and hold on a second, and whether it was done with an upward inflection or not? We're supposed to consider all that. I believe the court is supposed to consider that, Your Honor, but again, in the context of was it, given what the district court found, was it plausible in light of everything that Your Honor just discussed? Could the district court plausibly have reached the conclusion that it did, which we submit, yes, it could have. And after the hang on for a second comment, pick it up again there and go through his observation of the open container. In terms of the observation of the open container, you can't even actually see the container in the video because the body cam sits too low. Our position and why we didn't really brief even on, I will as an aside say, we don't concede actually that there was a trespass search. The reason, however, we did not brief it is we took the position that essentially the open container can be excised out relative to the analysis of the reasonable suspicion. It's simply, especially by given when the district court found that the seizure occurred, the open container for all intents and purposes for that analysis doesn't have to exist. It's not something that the officer was relying upon in order to make the detention, which actually brings me sort of to my second point about the delay period. Our position is that there was no extension of the stop because the whole point of the stop, once it became a stop, was to investigate some form of smuggling, be it drug smuggling, which it does seem from the record that's what the deputy thought it was, or could be still alien smuggling. So it wasn't a question of did he appropriately or inappropriately extend the stop. The question was did he diligently investigate what was the basis for the stop, and we submit that he did because in fact he had, when you look at what the court said, the court said the show of authority occurred when the deputy said I need to look in that truck, showing I'm a deputy and to discharge my duties, I have to do this thing. So before we move off of the container, to the extent that we think or we may think it's important to the analysis to study the chronology, is it your position that the container nonetheless was in plain view, the officer was in a position in which he was entitled to be and could see what he could see from that position? Yes, Your Honor, our position is that, and that's in part buttressed by the fact that for the officer, so we would maintain that the officer's physical position up against the truck was completely okay. The fact that then Mr. Laramore voluntarily, before the officer ever got up there, lowered the rear window, meaning anything that's visible in the back seat is visible to that officer is completely within bounds of then the officer's conduct. We would take that position. And the observation occurred just after he said hang on for a sec? That is correct. As he was beginning to move away, he saw the open container? That is correct. What the district court then found though is just simply the deputy gave no indication to Mr. Laramore that he knew that he saw it, so it doesn't come up again until about 15 or 16 minutes into the body cam where he mentions it, and then actually it comes up in the context of trying to locate the key, or whether or not there is a key at this point to the trailer, and the deputy brings it up to say look, I've seen an open container, that gives me probable cause to look in the truck. But that was after he said I need to see inside the trailer? That is correct, Your Honor. That's approximately 10 minutes. So the seizure, we would, based on the district court's ruling, the seizure occurs at 3 minutes and 58 seconds on the body cam video. We will point out that the deputy actually already had consent to search at that point. He actually received, so the seizure occurs at 3 minutes and 58 seconds. He actually receives consent to search the trailer at 3 minutes and 40 seconds. The deputy asks the appellant if he'd be willing to help the deputy look in the trailer, and the appellant says, quote, yeah. Then it becomes the discussion of not whether he can look in the trailer, it's how are they going to do it because of the locked trailer door. And I see my time has expired, so with that, pending any other questions by the court, we ask, the government asks that you affirm the district court's ruling. Thank you. Thank you, Mr. Bannister. Mr. O'Neill? Unless the court directs me otherwise, I'd like to discuss the four different paths to suppression that I see here. The first is if the seizure happened when Deputy Colonna pulls in behind Mr. Laramore and starts to approach him, or when he leans on the car to talk to him, making it dangerous for Mr. Laramore to drive away, the government has never claimed, disclaims that a reasonable suspicion at that point, therefore, the district court would have erred and the suppression motion should have been granted. The second path to suppression is to find that the seizure happened at the hang on a sec moment. The only thing that changes that I argue earlier in response to Chief Judge Elrod's question that changes is the open container. My friend for the government today tells us that the open container doesn't matter for this analysis, so it seems to me that the government is explicitly disclaiming any reliance on that, which I think makes my previous answer to Chief Judge Elrod's question different in that it doesn't make a difference now whether the seizure happened at the handshake and the physical contact with the vehicle, or as late as hang on a sec. The second route, or I guess the third route to suppression, is to find that the district court erred in finding consent to the search, and that it was in fact a probable cause search. That probable cause, though, was the fruit of the unlawful search of the car in order to view the container. I want to briefly touch on Judge Englehardt's question to my friend about the container being in plain view, because the record is very clear that the container was not in plain view. The district court, in fact, found that Kelowna had to lean in for a moment into Mr. Laramore's truck in order to spy an open container of alcohol on the floor in the back cab of the truck. So this is not . . . Let me stop you there. How far did he lean in? How far did he actually break the plane of the open window? So if you look at the video, it appears ICM is leaning in more than the district court characterizes it. The district court characterizes it as his hat or himself briefly breaking the plane of the open window. That's what I saw when I looked at it, was that the bill of his cap barely broke the plane of that open window. I agree, but I . . . It wasn't. He didn't stick his entire head in there and head and arms in there looking around. He leaned in slightly enough for the bill of his cap to break the plane of the open window. Yes, Your Honor, I agree, but I think it's the breaking of the plane is not the only thing that matters. I think it's also the physical contact with the truck. So in . . . But don't you think it's common? I can't imagine many situations when a police officer is talking to someone in a car, for whatever reason, that they don't put a hand on the car. Oh, I completely agree, and that's why . . . This court's cases on the trespasser research tell us that incidental touch is fine, but here the deputy testified that he had to lean on the truck and had to peer in, in order to look for the open container, and that that's what he was doing. So it's the trespass combined with the intent to gain a broader field of view than you otherwise would that takes the open container outside of plain view and makes this a trespass research. So if you were to agree with me on that argument, you would find that that search was unlawful, and that it is then the fruits of that search, his observation of the open container, that Deputy Colonna uses about 17 minutes later to finally get Mr. Laramore to admit what's going on. He confronts him with his observation of the open container, saying, you know, I observed an open container earlier. That gives me probable cause to search your truck. If I search your truck, am I going to find the key to that trailer? And Mr. Laramore says, oh, well, you might, and he says, because I'm going to, you know, I'm going to search that truck, and then that's what causes Mr. Laramore finally to say there are people in that car. But wasn't that after the government concedes that there was a stop? Yes, Your Honor, that happened, that happened after the government concedes that a seizure happened. So under any one scenario that we view it at that point, was there reasonable suspicion at that point? Uh, no, I think they're independent analyses. So we have an unlawful search. I think this argument is independent of when the seizure happens, right, because regardless of whether the seizure happens before the search or after the search, the search happens. The search is a trespass research that's unlawful. It's not supported by probable cause at that point. And then the only question is, what are the fruits of that search? So regardless of whether... I just want to clarify, I don't understand what you're saying. My point is that the, the fruits of the search, the comment that was made that caused him to talk about the key, was after, uh, the government concedes that there was a stop. I agree, Your Honor, yes. Do you want to make that point clear? Yes, yes. I, I, I think, yes. What's the fourth point again? The, the, so there's, there's the seizure, uh, and whether it was supported by reasonable suspicion. Uh, there's whether, and those are two points that collapse into one, I think, with the government's admission. The third or second, depending on how you number them, is the fruit of the unlawful search, uh, being used against Mr. Laramore. And then the fourth one is whether, uh, there was reasonable suspicion at the point that the government concedes that there was a seizure. Thank you. We have your argument. Thank you. I want to just say that the arguments that we heard today were very helpful to the court. And this is exactly the type of, uh, argument that is envisioned when we teach at law schools and such about how learned colleagues are instructing the court as to what the facts and the law in a case are about. And so, both lawyers did an exemplary job of answering the court's questions. And we note that Mr. O'Neill is court-appointed and we appreciate your service. Thank you both. The case is submitted. Thank you.